UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------------- x
JAMES POLK,                                                      :
                                                                :
                                        Plaintiff,              :
                                                                :
                    v.                                          :           3:23-cv-728 (SFR)
                                                                :
RICHARD FISHER, *et al.*                                        :
                                                                :
                                        Defendants.             :
--------------------------------------------------------------- x

**Sarah F. Russell**, United States District Judge:

## MEMORANDUM OF DECISION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff James M. Polk brings this complaint, *pro se*, under 42 U.S.C. § 1983. Mr. Polk is serving a sentence of incarceration in the custody of the Connecticut Department of Correction ("DOC"). He sues four dentists in their individual and official capacities: Dr. Richard Fisher, Dr. Peter O'Shea, Dr. Alphonso Mack, and Dr. Maher Kasabji. Mr. Polk asserts that Defendants have acted with deliberate indifference to his dental treatment needs and pain in violation of the Eight Amendment to the U.S. Constitution.

For the reasons set forth below, I grant the motion for summary judgment in part and deny the motion for summary judgment in part.[1]

---

[1] After initial review, the Court permitted Mr. Polk to proceed on his Eighth Amendment claims against Dr. Fisher, Dr. O'Shea, Dr. Mack and Dr. Kasabji who treated him during his incarceration at Cheshire Correctional Institution ("Cheshire"). ECF No. 13, Initial Review Order ("IRO").

## I.    **FACTUAL BACKGROUND**

The following factual background is taken from the complaint,[2] the parties' Local Rule

56 statements ("L.R."),[3] declarations submitted by the parties, and the underlying evidentiary

record.[4] At the time relevant to this action, Mr. Polk was serving a sentence of incarceration in

the custody of the Connecticut DOC. ECF No. 36-2, Defs.' L.R. ¶¶ 5-10. Mr. Polk has been

housed at Cheshire Correctional Institution ("Cheshire") since August 8, 2016 except for

several brief periods of time when he was transferred temporarily to MacDougall-Walker

Correctional Institution ("MacDougall"). *Id.* ¶¶ 7-8.[5]

---

[2] My review of the record includes the allegations of the complaint. *See Jordan v. LaFrance*, No. 3:18-cv-1541 (MPS), 2019 WL 5064692, at *1 n.1 (D. Conn. Oct. 9, 2019) (noting that a verified complaint may be considered as an affidavit for summary judgment purposes); *Walcott v. Connaughton*, No. 3:17-cv-1150 (JCH), 2018 WL 6624195, at *1 n.1 (D. Conn. Dec. 18, 2018) (same).

[3] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides, in relevant part: "Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." It states that the "[f]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1[]." *Id.*

Generally, I cite only to the relevant paragraph in the Local Rule 56(a)1 Statement as the facts are not disputed. The page numbers cited to in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

[4] Defendants have certified they provided Mr. Polk with the Notice to *Pro Se Litigant* in compliance with Local Rule of Civil Procedure 56(b). ECF No. 36-10, Notice to *Pro Se* Litigant.

[5] From November 30 to December 7, 2020, Mr. Polk was housed in the medical isolation unit at MacDougall. ECF No. 36-2, Defs.' L.R. ¶¶ 9-10. After his return to Cheshire on December 7, 2022, Mr. Polk was again transferred to the medical isolation unit at MacDougall on August 18, 2022, where he remained until he was returned to Cheshire on August 26, 2022. *Id.* He was

DOC provides individuals in its custody with dental services, including dental examinations, diagnostic services, preventive services, restorative services, endodontic services, removable prosthodontics, and dental surgical and outpatient procedures. *See* ECF No. 36-4 at 31-32, Dir. 8.4 § (5).[6] If an incarcerated individual requires a level of dental care beyond that which can be provided by the dental unit, a referral is submitted for review and disposition. *Id.* 8.4 § (10); ECF No. 36-2, Defs.' L.R. ¶ 36. Individuals can request dental treatment by way of completing an inmate request form (CN 9601). ECF No. 36-2, Defs.' L.R. ¶ 40.

### A.    Visits with Dr. Fisher: 2020-2021

Prior to his incarceration, Mr. Polk received a fixed dental bridge. ECF No. 1, Compl. ¶ 10. A fixed dental bridge replaces missing teeth with artificial ones by joining the artificial tooth to adjacent teeth. Here, Mr. Polk had a fixed dental bridge which replaced tooth #10 with an artificial tooth and was joined to adjacent tooth #9 and tooth #11. *Id.* ¶¶ 10, 13.

In September 2020, after the bridge became loose, Mr. Polk says he began to experience pain in the location of tooth #11. *Id.* ¶¶ 13-14. On September 29, 2020, Dr. Fisher, a dentist at Cheshire, saw Mr. Polk. ECF No. 36-2, Defs.' L.R. ¶ 53. Dr. Fisher determined that tooth #11 was loose. *Id.* ¶ 79. According to Dr. Fisher, radiographic images conducted at the time showed tooth #9 to be "poorly obturated root canal therapy with well-circumscribed lesion apex" and tooth #11 "showed evidence of fracture." ECF No. 36-4, Fisher Decl. ¶ 22.

---

transferred to MacDougall on April 17, 2024, but returned to Cheshire on April 29, 2024, where he remains to date. *Id.* ¶¶ 10-11.

[6] Defendants have appended a copy of Administrative Directive ("Dir.") 8.4 to Dr. Fisher's declaration. ECF No. 36-4, Fisher Decl. at 30-33.

In his declaration, Dr. Fisher says that at this September 29, 2020 visit he "discussed treatment of the bridge and its compromised teeth" with Mr. Polk. *Id*. In particular, he says he "informed [Mr. Polk] that the bridge was failing, discussed exodontia and the fabrication of a removal upper denture, and not a fixed bridge, consistent with DOC policy." *Id*. Dr. Fisher explains that he did not recommend restoration of the bridge "due to the fact that the bridge had become loose, most likely due to the fracture found in tooth #11, and tooth #9 was in bad shape in that the root canal therapy showed signs of deterioration and the existence of a large lesion at the apical area of the tooth indicating that this tooth is proceeding to apical inflammation and possibly pain." *Id*. ¶ 25. He states further that "[l]eaving the fixed denture in place until a decision was made did not put Mr. Polk at risk of serious future or further harm," and that any harm resulting from leaving the fixed denture in place was the development of an abscess treatable "with antibiotics, possible incision and drainage, and pain relief medication." *Id*.

Dr. Fisher said no final decision was made about the treatment plan at the September 29, 2020 visit, "as Polk required time to think about it." *Id*. ¶ 22. Dr. Fisher explains that he did not prescribe pain medication at the time because he assessed—based on his observations during the examination—that none was medically necessary. *Id*. The medical record for the September 29, 2020 appointment states that Mr. Polk's pain was a level 3, indicating "Minor Pain." ECF No. 37, Med. Rec. 19. The record indicates that Mr. Polk "advised" he was "thinking" about his discussion with Dr. Fisher regarding a treatment plan. *Id*. at 24. Dr. Fisher recorded Mr. Polk's dental classification as Class 2—Routine dental needs with conditions unlikely to become emergent within twelve months. *Id*.

Case 3:23-cv-00728-SFR     Document 48     Filed 03/31/25     Page 5 of 35

In describing his visit with Dr. Fisher, Mr. Polk asserts that the X-rays confirmed that his bridge was loose and needed to be repaired, but Dr. Fisher advised him that the repair could not be performed at that time due to a lack of the proper tool for the procedure. ECF No. 1, Compl. ¶¶ 15-16. According to Mr. Polk, Dr. Fisher stated that there was an alternative to remove the bridge but doing so could risk damaging it and Mr. Polk would then require a partial temporary dental prosthetic. *Id*. ¶ 16. Mr. Polk asserts that he indicated to Dr. Fisher that he was willing to take the risk to alleviate his "extreme" pain, but Dr. Fisher stated he was unwilling to perform the procedure as it was technical and time consuming. *Id*. ¶ 17. According to Mr. Polk, Dr. Fisher stated Mr. Polk would have to endure the pain while he waited for a follow up and refused to provide him with pain relief medication because he did not want to spend resources on Mr. Polk. *Id*. ¶¶ 17-18. Mr. Polk says that Dr. Fisher never told him that tooth #11 was fractured. ECF No. 42, Polk Decl. ¶ 2. Mr. Polk asserts that in the months that followed this appointment he wrote several inmate request forms to dental and received no response. ECF No. 1, Compl. ¶ 19. He "suffered and endured periodic bouts of facial paralysis, swelling, and ongoing pain proximate to the affected bridge." *Id*. ¶ 20.

Dr. Fisher saw Mr. Polk again almost a year later on August 9, 2021, for his complaints about a loose filling and pain. ECF No. 36-2, Defs.' L.R. ¶ 54. After examination, Dr. Fisher determined that the missing amalgam on tooth #29 would need to be restored. *Id*. Dr. Fisher states that he restored tooth #29 and did not prescribe Mr. Polk with any pain relief medication because such medication was not medically necessary. ECF No. 36-3, Fisher Decl. ¶ 26. Again, Mr. Polk's dental classification remained at Class 2. ECF No. 36-2, Defs.' L.R. ¶ 54.

B.      **Visits with Dr. O'Shea: 2022**

Mr. Polk says that in May 2022, he experienced facial swelling, paralysis, and unbearable pain. ECF No. 1, Compl. ¶¶ 24-25. On May 27 and 28, 2022, Mr. Polk submitted requests for dental services for his complaints of pain associated with his bridge. ECF No. 36-2, Defs.' L.R. ¶¶ 55-56. In his May 28, 2022 request for care, Mr. Polk referenced the bridge and stated: "I've seen you a couple of times for this and was told you don't have the tool to remove the bridge and recement it and the pain has persisted and is now unbearable." ECF No. 37, Med. Rec. 32.

On May 31, 2022, Mr. Polk was seen by Dr. O'Shea. ECF No. 36-2, Defs.' L.R. ¶ 57. The medical record from May 31, 2022 reflects Dr. O'Shea diagnosed an abscess associated with tooth #11; performed an incision and drainage; prescribed antibiotics, Ibuprofen, and Tylenol #3; and suggested a follow up in twenty-four hours with the possibility to enter tooth #11 for further drainage, if warranted. ECF No. 37, Med. Rec. 37-38. Dr. O'Shea changed Mr. Polk's dental classification to Class 3—urgent dental needs with conditions requiring immediate treatment or conditions likely to become emergent in under twelve months. *Id*. at 38.

The next day, on June 1, 2022, Dr. O'Shea saw Mr. Polk in a follow up visit for the incision and drainage of abscess for tooth #11. ECF No. 36-2, Defs.' L.R. ¶ 58. The medical record from the visit indicates a decrease in pain and swelling. *Id*. Radiographic imaging revealed a crown fracture into the pulp of tooth #11. *Id*. In his declaration, Dr. O'Shea states that DOC policy would not allow for a restoration with a post/core/crown for tooth #11, and says that he "informed Polk that once the full course of antibiotics was completed, he should pursue surgical extraction of this tooth and removal of the bridge." ECF No. 36-5, O'Shea

Decl. ¶ 21. Dr. O'Shea says that Mr. Polk "was in agreement with the plan of treatment despite the fact that an upper denture could not be fabricated until all teeth were extracted, thereby leaving him with an unsightly smile for a period of time." *Id*. ¶ 21. Dr. O'Shea states that he could not perform this recommended treatment plan prior to Mr. Polk's completion of his antibiotics and reduction of his swelling, although he was aware Mr. Polk could develop further abscesses without the treatment for the bridge removal and tooth extraction. *Id*. ¶¶ 25-26. Dr. O'Shea asserts that he advised Mr. Polk to return to the dental unit to explore surgery after completion of a full course of antibiotics. *Id*. ¶ 21. The medical record reflects that a seven-day course of antibiotics was prescribed on May 31, 2022. The record for June 1, 2022 states: "pt informed that after full course of abx surgical OSx needs to be planned[.] He was in agreement and acknowledged an understanding of the clinical situation." ECF No. 37, Med. Rec. 43. Mr. Polk's dental classification remained at Class 3—urgent dental needs. ECF No. 36-2, Defs.' L.R. ¶ 58.

In describing the visits with Dr. O'Shea, Mr. Polk says he experienced "acute pain" because Dr. O'Shea declined to use a local anesthesia when he incised and drained the abscess. ECF No. 1, Compl. ¶ 28. Mr. Polk asserts that Dr. O'Shea advised him that teeth #9 and #10 needed to be cut from the bridge and tooth #11 was completely broken and needed to be extracted. *Id*. ¶¶ 29-30. Mr. Polk states that Dr. O'Shea told him to "deal with" the pain while completing the course of antibiotics and that he would be "automatically" called back for dental treatment after a week. *Id*. ¶ 30.

Mr. Polk states he was not called back after he finished the antibiotics as indicated by Dr. O'Shea. *Id*. ¶ 31. On June 23, 2022, Mr. Polk submitted an inmate request form stating: "I saw you 2 weeks ago for an abses [sic] in the front of my mouth and you gave me antibiotics

and said you needed to cut 2 teeth off of the bridge in the front upper of my mouth because the tooth under it is broken. I am still waiting to be called by you to have this done." ECF No. 42, Pl. Resp. 18. On July 18, 2022, Mr. Polk received a response stating "[y]ou are entered in comp," which Mr. Polk understood to mean he was entered in the computer's waiting list to be seen by the dentist. *Id*.; ECF No. 1, Compl. ¶¶ 32-33. Mr. Polk states that he never received a dental follow up visit with Dr. O'Shea. ECF No. 1, Compl. ¶ 33. In explaining the lack of follow up, Dr. O'Shea states: "Shortly after my interaction with Polk in the dental unit, I was transferred to another facility. As a result, I could not call him back to the dental unit." ECF No. 36-5, O'Shea Decl. ¶ 22. Dr. O'Shea says he does not remember any communication with Mr. Polk on June 23, 2022. *Id*. ¶ 24. Dr. O'Shea does not provide the date of his transfer to another facility.

### C.    Visits with Dr. Mack: 2022-2023

On October 28, 2022, Dr. Mack saw Mr. Polk for a dental examination. ECF No. 36-2, Defs.' L.R. ¶ 59. Dr. Mack focused on enamel restoration for tooth #16. *Id*. The medical record indicates that Mr. Polk's dental classification was assessed that day as Class 3—urgent dental needs. *Id*. Mr. Polk says that during the visit he asked Dr. Mack about not being called back to have the bridge sectioned and tooth #11 extracted. ECF No. 42, Pl. Resp. 18. According to Mr. Polk, Dr. Mack informed him that the root of tooth #11 was very close to the sinus cavity and the tooth would need to be removed by an oral surgeon at UConn rather than removed at Cheshire. *Id*. Mr. Polk asserts that Dr. Mack told him that he would place Mr. Polk on the list for oral surgery. *Id*. In describing this visit in his declaration, Dr. Mack states: "I recall being hesitant to extract tooth # 11 as it was close to the sinus cavity. In my dental judgment, I believed that extraction of tooth # 11 would best be handled by an oral surgeon with more

8

experience in removing teeth near sinus cavities. Because Polk continued to reject the recommended treatment plan, I did not submit a request for approval of extraction by a specialist." ECF No. 36-6, Mack Decl. ¶ 13.

Following the October 28, 2022 visit with Dr. Mack, Mr. Polk submitted a Level 1 Health Services Administrative Remedy ("HSAR") dated November 5, 2022, for a diagnostic and treatment issue. In the HSAR, Mr. Polk stated:

> I went to dental over a year ago because the bridge in the upper front of my mouth is loos[e] on the left side. The dentist informed me that the[re] is only one tool in the state for removing a bridge and he didn't know if he could even get it. He took an xray and told me he would call me once he tried to get the tool. In June I get an abs[c]es[s] on the gum above the bridge and saw the new dentist[.] [H]e gave me antibiotics and said he would call me the following week to remove the bridge. He took an xray and found the tooth under the bridge was now broke. He never called me to deal with it. I went to dental last week because a tooth broke and while I was there I asked the new dentist about it and he said I may loose my three teeth and have to get a partial. He also said that their equipment isn't working properly. I need this dealt with A.S.A.P. and want to see an outside dentist.

ECF No. 36-2, Defs.' L.R. ¶ 74; ECF No. 37, HSARs 26.

Mr. Polk later submitted a Level 2 HSAR dated December 19, 2022. ECF No. 36-2, Defs.' L.R. ¶ 74; ECF No. 36-8, HSARs 25. He complained that he had not "received a response to [his] level 1 administrative remedy" and wanted "to see a dentist in the community to get proper dental care because [he was] not receiving it from DOC." *Id*.

In a letter dated December 21, 2022, HSRC Cruz advised Mr. Polk that his "diagnosis/treatment administrative remedy submitted November 8, 2022, is with the department awaiting response." ECF No. 36-8, HSARs 24. She advised him further that "diagnosis/treatment remedies are not subject to appeal." *Id*.

In an inmate request form submitted to the Regional Chief Operating Officer dated January 27, 2023, Mr. Polk said he recently learned that he "will have to go to UConn to get surgery" relating to tooth #11. ECF No. 42, Pl. Resp. 32. He said: "I have been complaining about this issue and the pain for over two years" and "based on what the dentist told me I'm concerned about how bad this has gotten." "I want to ensure going forward that I get adequate care promptly to prevent future damage." *Id.* Also on January 27, 2023, Mr. Polk submitted another inmate request form to HSRC Cruz, stating that he "would still like a written response" for his dental grievance and that he was "concerned" that he was "not going to receive adequate treatment going forward." ECF No. 36-8, HSARs 28. In a response dated February 3, 2023, HSRC Cruz responded that she was waiting for his HSAR to be returned to her. *Id.*

On February 6, 2023, Dr. Mack upheld Mr. Polk's Level 1 HSAR dated November 5, 2022. Relevant to Mr. Polk's concern about his bridge, Dr. Mack stated:

> As I see it, the complaint is about how + when to treat a broken maxillary bridge (9, 10, 11). The abutment #11 is broken + needs to be removed. In doing so the bridge will have to be sacrificed. The issue was referred to oral surgery to remove the broken tooth #11. Afterward a maxillary partial denture can be made.

ECF No. 36-8, HSARs 27. Dr. Mack concluded by indicating that "the case has been sent to OSS for tooth removal of #11" and that "[a] treatment plan of a Post + Core of #6 + a maxillary partial denture replacing teeth #10, #11 is in order." *Id.* In his declaration, Dr. Mack does not reference or explain this February 6, 2023 communication with Mr. Polk. *See* ECF No. 36-6, Mack Decl.

On February 15, 2023, Mr. Polk submitted an inmate request form to Dr. Mack stating:

> I saw you on 1-25-23 and you gave me 15 days worth of Amoxicillan [sic] to take and I have finished it all. I would like to know how long it will be until I

> go to UConn to have the broken teeth and bridge removed. I am experiencing pain in the gum and it hurts to touch."

ECF No. 42, Pl. Resp. 28. Although Mr. Polk references a visit with Dr. Mack on January 25, 2023 in this inmate request form, Defendants have provided no medical records relating to a visit on that day. In addition, Dr. Mack's declaration does not reference a January 25, 2023 visit.

On February 17, 2023, in response to Mr. Polk's January 27, 2023 inmate request form directed to the Regional Chief Operating Officer, Dr. Kasabji noted that Mr. Polk's tooth #11 was fractured under the bridge due to "heavy build up and loss of tooth structure" and that there was "no treatment . . . other than extraction" for his fractured tooth. ECF No. 42, Pl. Resp. 32. Dr. Kasabji stated that "tooth extraction can be done at the facility." *Id*.

On February 28, 2023, Mr. Polk filed another Level 1 HSAR with the box checked for review of an administrative issue. ECF No. 36-8, HSARs 29-31. In it, Mr. Polk wrote:

> I am filing an administrative appeal of the response given by Dr. Kasabji (attached) wherein he claims that the requisite dental care can be provided to me at the facility. I was previously advised by the facility dental staff that this procedure cannot be performed here. Therefore one of these staff people is incorrect. This needs to be corrected so I can be immediate scheduled in the appropriate place for treatment.

*Id.*

On March 3, 2023, Dr. Mack saw Mr. Polk. ECF No. 36-2, Defs.' L.R. ¶ 60; ECF No. 36-6, Mack Decl. ¶ 14. The medical record from that visit states: "Patient was seen again, concerning his anterior bridge. Suffice it to say, it has been determined that Dr. Kasabji will extract tooth #11. Arrangements for such will be made." ECF No. 37, Pl. Resp. 52. The medical record indicates that Mr. Polk's dental classification was assessed that day as Class 3—urgent dental needs. *Id*. In his declaration, Dr. Mack describes this visit March 3, 2023 visit as follows:

"Polk was informed that the treatment plan could be handled by Dr. Kasabji, who agreed to extract tooth # 11 instead of waiting for an appointment with a specialist. No final decision was made by Polk on whether to proceed with the plan as recommended." ECF No. 36-6, Mack Decl. ¶ 14.

On March 16, 2023, Dr. Mack upheld in part Mr. Polk's Level 1 HSAR, which had been submitted on February 28, 2023. ECF No. 36-8, HSARs 30. Dr. Mack advised that "[d]entures are not warranted" because Mr. Polk "would have to have more teeth removed in order to qualify for a full/partial denture." *Id*. He stated further that "Dr. K[asabji] will come in and perform extractions to enable a plate to be made" if Mr. Polk was willing. *Id*. Dr. Mack indicated that this decision was not subject to further appeal. *Id*.

On May 5, 2023, Mr. Polk submitted an inmate request form to Dr. Mack that stated:

> The last time I saw you you gave me Advil Dual Action and said to give you two weeks to try to get Dr. Kasabji to come here and remove the broken tooth under my bridge and that was about 2 months ago and I still haven't gone to UConn for the surgery you said I need to have the tooth removed. I'm in pain and now I'm getting blisters on my gum above the bridge and #11 tooth. I'm afraid it will turn into another absess if this is in need of imm[e]diate attention like you said it is. Why am I still waiting for treatment?

ECF No. 42, Pl. Resp. 35.

On May 23, 2023, Dr. Mack saw Mr. Polk for a follow up visit about the extraction of tooth #11. ECF No. 36-2, Defs.' L.R. ¶ 61. During his examination of tooth #11, Dr. Mack observed a draining fistula associated with tooth #11 and prescribed an antibiotic. *Id*. ¶¶ 61, 94. The medical record from the visit state that "patient expressed his frustration with the time it has taken to get his dental needs satisfied" and "[p]atient was discharged with the expectation that his dental problems would be corrected soon." ECF No. 37, Med. Rec. 58. In describing the May 23, 2023 visit in his declaration, Dr. Mack states that Mr. Polk did not respond after

he advised him that the extraction process was being planned ECF No. 36-6, Mack Decl. ¶ 15. Dr. Mack says that he took Mr. Polk's silence to signify his agreement with the treatment plan. *Id*. The medical record indicates that Mr. Polk's dental classification was assessed that day as Class 3—urgent dental needs. ECF No. 37, Med. Rec. 59.

Mr. Polk asserts that during the May 23, 2023 visit he asked Dr. Mack why he was not being seen by UConn after such a long time on the waiting list. ECF No. 1, Compl. ¶ 45. According to Mr. Polk, Dr. Mack advised him that his name was removed from the dental waiting list at UConn because Dr. Kasabji could provide the treatment at Cheshire. *Id*. ¶¶ 46-47. Mr. Polk says Dr. Mack apologized for the inadequate treatment and promised to call Dr. Kasabji to get Mr. Polk treatment. *Id*. ¶ 48.

In his declaration, Dr. Mack maintains: "Though the treatment plan could have been achieved in 2020, it was Polk's continued refusal to proceed with the plan that resulted in the development of abscess and fistula. Once Polk agreed with the treatment plan, the tooth was extracted in short course." ECF No. 36-6, Mack Decl. ¶ 24.

At the time Mr. Polk drafted his Complaint, he said tooth #11 had not yet been extracted. Compl. ¶ 49. Mr. Polk's Complaint was sent to the Court in an envelope postmarked June 1, 2023. ECF No. 1-1.

On June 1, 2023, Dr. Kasabji extracted tooth #11 after Mr. Polk executed his written consent to the oral surgery. ECF No. 36-2, Defs.' L.R. ¶¶ 62, 101; ECF No. 37, Med. Rec. 61. During the process, Dr. Kasabji sectioned off the dental bridge through the use of a dental drill, extracted tooth #11, and recemented the bridge to pontic tooth #10. ECF No. 36-2, Defs.' L.R. ¶¶ 62, 105; ECF No. 37, Med. Rec. 62-67. The relevant medical record indicates that Mr. Polk was prescribed pain relief medication and informed that he would be evaluated for an upper

13

right partial denture after completion of all necessary dental treatment at his next visit. ECF No. 37, Med. Rec. 66. At that time, Mr. Polk's dental classification changed back to Class 2—Routine dental needs. *Id*.

Following the filing of the Complaint, on June 8, 2023, Dr. Mack saw Mr. Polk for a complaint about pain he experienced associated with the extraction. ECF No. 36-2, Defs.' L.R. ¶ 63. Dr. Mack provided treatment for Mr. Polk's diagnosed "dry socket." *Id*. Mr. Polk's dental classification remained at Class 2—Routine dental needs. *Id*.

On June 28, 2023, Dr. Mack saw Mr. Polk in another follow up. *Id*. ¶ 64. The relevant medical record reflects that Dr. Mack noted the area of the extraction "appear[ed] to be healing well" with the bone fill commencing. ECF No. 37, Med. Rec. 78. Mr. Polk's dental classification remained at Class 2. *Id*. at 79.

On October 25, 2023, Dr. Mack saw Mr. Polk for a broken filling at tooth #15. ECF No. 36-2, Defs.' L.R. ¶ 65. Upon examination, Dr. Mack excavated the tooth, covered it with cavit and made a referral for specialty services for extraction of tooth #15. *Id*. Mr. Polk's dental classification remained the same. *Id*. Later in November 2023, the cavit fell off of Mr. Polk's tooth #15. *Id*. ¶ 66. The relevant medical note states that Mr. Polk was informed that having his tooth uncovered was not a problem, that the tooth was scheduled for extraction, and that he was unlikely to have pain from it at that time. ECF No. 37, Med. Rec. 86.

In January 2024, Dr. Mack saw Mr. Polk about his complaint for his painful and loose tooth #14. ECF No. 36-2, Defs.' L.R. ¶ 67; ECF No. 36-6, Mack Decl. ¶ 21. In the medical note for that appointment, Dr. Mack indicated that Mr. Polk did "not want to lose tooth #14." ECF No. 37, Med. Rec. 87. Mr. Polk's dental classification remained at Class 2. *Id*. at 88.

On March 22, 2024, Mr. Polk had an appointment with Dental Hygienist Sharon Strobel and Dr. Gloria Perry for annual preventive care. ECF No. 36-2, Defs.' L.R. ¶ 68. The medical note reflects that Mr. Polk stated he had been "told [an] oral surgeon needs to extract #15" and that he was "on the list." ECF No. 37, Med. Rec. 94. Strobel noted that she "contacted Dr. Mack and inquired if [Mr. Polk] is still on the list for UCONN and instructed Polk to rewrite Mack and advise." *Id.*

## II.    <u>LEGAL STANDARD</u>

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co*., 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . . ." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of

material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (internal

quotation marks omitted). To defeat a motion for summary judgment, the nonmoving party

must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island

R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Although I am required to read a self-represented "party's papers liberally and interpret

them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51,

62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not

overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*,

224 F.3d 33, 41 (2d Cir. 2000).

## III.    DISCUSSION

Defendants argue that Mr. Polk has not exhausted his administrative remedies in

compliance with the Prison Litigation Reform Act ("PLRA") and cannot show deliberate

indifference to his serious dental health needs in violation of the Eighth Amendment. ECF No.

36-1, Defs.' Mem. 13-33.

### A.    Exhaustion of Administrative Remedies

The PLRA requires an incarcerated individual pursuing a federal lawsuit to exhaust

available administrative remedies before a court may hear the case. *See* 42 U.S.C. § 1997e(a)

(providing in pertinent part that "[n]o action shall be brought with respect to prison conditions

under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted");

*see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement

applies to all inmate suits about prison life, whether they involve general circumstances or

particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion"; the individual must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.

An individual's failure to exhaust administrative remedies is excusable only if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 642. The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id*. (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).

Mr. Polk's exhaustion of his claims concerning his dental issues is governed by DOC's Administrative Directive 8.9.  Under the current version of Directive 8.9, which was in effect at the time Mr. Polk filed his HSARs, there are two types of health services administrative remedies. A diagnosis and treatment remedy seeks "review of diagnosis or treatment decision made by a physician, psychiatrist, advanced practice registered nurse (APRN), physician assistant (PA), physician assistant-certified (PA-C), or dentist." ECF No. 36-8, Dir. 8.9 § (6)(a)(i). An administrative issue remedy seeks "review of a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider." *Id*. § (6)(a)(ii).

The relevant procedures are as follows. Upon receipt, the health services administrative remedy is reviewed for compliance with the provisions in Directive 8.9. If the request is not in compliance, it is rejected. *Id*. § (6)(b)(i). The person who submitted the request is afforded five calendar days to correct the procedural deficiency and refile the remedy. *Id*. § (6)(c)(ii)(2)(a)(i)(1).

For a diagnosis and treatment remedy, the person submitting the request "shall concisely explain the specific diagnosis or treatment decision and specify the date of diagnosis or treatment." In addition, the person "shall explain how he or she is dissatisfied with the diagnosis and treatment, how he or she has been affected, and concisely state the resolution desired." *Id*. § (6)(c)(i)(1). Upon receipt of a diagnosis and treatment remedy, the health services administrative remedy coordinator ("HSRC") consults the provider who made the decision to determine what action, if any, should be taken. *Id*. § (6)(c)(i)(2)(a). If the provider decides that the existing diagnosis or treatment is appropriate, the remedy is denied and may not be appealed. See *Id*. If the provider decides that further evaluation is needed, he may schedule a health services review appointment. *Id*. (6)(c)(i)(2)(b). The Level 1 HSAR "must be filed within 30 calendar days of the occurrence or discovery of the cause of or reason for the request for the Health Services Administrative Remedy." *Id*. (6)(b)(iii)(4).

Defendants argue that Mr. Polk's Level 1 Diagnostic/Treatment HSAR—which requested dental treatment due to his loose bridge, abscess, and broken tooth—addressed only his dental issues prior to its submission date of November 5, 2022. ECF No. 36-1, Defs.' Mem. 18. Defendants maintain that Mr. Polk failed to pursue his remedies for his treatment needs after his "clinical situation changed" when a "draining fistula was found associated with tooth #11" on March 23, 2023. *Id*. at 18. I disagree.

Mr. Polk was not required to file additional HSARs after November 5, 2022 relating to his unrepaired bridge and loose tooth #11. A grievance need not name all defendants but must alert prison officials to a problem and the "level of detail necessary in a grievance" is defined by the prison directives. *Jones*, 549 U.S. at 217; *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) ("inmates must provide enough information [in a prison grievance] about the conduct of which they complain to allow prison officials to take appropriate responsive measures").

As an initial matter, Mr. Polk did not even receive Dr. Mack's response to his Level 1 Diagnostic/Treatment HSAR until February 2023, despite his effort to elicit a response by filing his Level 2 HSAR and an inmate request form. *See* ECF No. 36-8, HSARs 25, 28. Furthermore, Mr. Polk's Level 1 HSAR dated November 5, 2022 provided sufficient detail for Dr. Mack to provide him with a responsive treatment plan related to complications from his unrepaired bridge and impaired tooth #11.

Mr. Polk's Level 1 HSAR for an administrative matter dated February 28, 2023 was also sufficient to exhaust his claims arising from the treatment delay for tooth #11. *See id.* at 29-31. Even if Mr. Polk's HSAR seeking immediate dental treatment was improperly filed as an Administrative rather than a Diagnostic/Treatment HSAR, it was not rejected as procedurally improper. Generally, untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements. *Rogers v. Cusson*, No. 3:21-cv-1710 (OAW), 2023 WL 8360667, at *4 (D. Conn. Dec. 1, 2023). However, a procedurally defective HSAR satisfies PLRA exhaustion "if it is accepted and decided on the merits by the appropriate prison authority." *Hill v. Curcione*, 657 F.3d 116, 125 (2d Cir. 2011). Here, Dr. Mack issued a response to explain that the extraction could be

performed at DOC by Dr. Kasabji. ECF No. 36-8, HSARs 30. Consistent with the procedure for a Diagnostic/Treatment HSAR, Dr. Mack checked the box to indicate that the decision was not subject to further appeal. *See id.*; ECF No. 36-8, Dir. 8.9 § (6)(c)(i)(2)(a).

Accordingly, I conclude that Mr. Polk has sufficiently exhausted his Eighth Amendment claims arising from his treatment denial or delay for his damaged bridge, impaired tooth #11, and related conditions.

Thus, I consider the merits of Mr. Polk's Eighth Amendment claims.

**B.    Eighth Amendment Deliberate Indifference**

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Second Circuit has applied the deliberate indifference standard set forth in *Estelle* to claims of denials or delay in the treatment of dental needs. *See Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (applying deliberate indifference standard in *Estelle* to claim of untreated tooth cavity); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (deliberate indifference to medical needs standard applicable to claim that prison dentist failed to property treat severe tooth decay). There is a subjective and an objective component to the deliberate indifference standard. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

**1.    Objective Element**

To establish the objective component of an Eighth Amendment violation, the alleged deprivation of medical care must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The Second Circuit has *Id*entified several non-exhaustive factors relevant to the inquiry into the seriousness of a medical condition: "an injury that a reasonable doctor or patient would

find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (internal quotation marks and citation omitted).

If the prisoner's claim arises from an unreasonable delay in treatment or a challenge to the kind of treatment received, the seriousness inquiry focuses on the challenged delay or treatment "rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance,* 143 F.3d at 702). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Id.* (focusing on the particular risks attributable to the missed HIV medication, rather than on Smith's HIV positive status alone).

Here, the record reflects that Mr. Polk continued to experience pain and deterioration of his dental health in connection with his damaged dental bridge and impaired condition of tooth #11 after he saw Dr. Fisher on September 29, 2020. *See* ECF No. 37, Med. Rec. 23-24, 33, 38-43, 52, 58, 66; ECF No. 36-8, HSARs 26-27, 31. Read in Mr. Polk's favor, the evidence supports his claim that he suffered serious dental pain and increasingly severe conditions due to the treatment delay for his damaged dental bridge and tooth #11.

Accordingly, Mr. Polk has satisfied the objective component of the Eighth Amendment standard for purposes of defeating Defendants' motion for summary judgment. I turn next to Defendants' argument that Mr. Polk cannot satisfy, as a matter of law, the subjective element of the Eighth Amendment analysis.

### 2.    Subjective Element

To satisfy the subjective component of the Eighth Amendment's deliberate indifference standard, a defendant must have been aware of a substantial risk that the incarcerated individual would suffer serious harm because of his or her actions or inactions. *See Salahuddin,* 467 F.3d at 280. Deliberate indifference is more than mere negligence—it is equivalent to "criminal recklessness," where an individual "disregards a risk of harm of which he is aware." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In general, medical malpractice does not suffice for deliberate indifference. *Estelle*, 429 U.S. at 106. Medical malpractice, may, however, rise to deliberate indifference if it "involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin*, 467 F.3d at 280.

"The state of the defendant's knowledge is normally a question of fact to be determined after trial." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). "Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (citing *Farmer*, 511 U.S. at 842); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Hudak v. Miller*, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (Sotomayor, J.) ("[I]f the evidence shows that the risk of serious medical problems was so obvious that a reasonable factfinder

could infer actual knowledge of them on [defendant's] part, this Court must deny summary judgment."); *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *Bardo v. Wright*, No. 3:17-cv-1430 (JBA), 2019 WL 5864820, at *7 (D. Conn. Nov. 8, 2019).

It is well established that "[a] prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (citing *Estelle*, 429 U.S. at 106–07)). A medical provider may, however, act with deliberate indifference by consciously providing an individual with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper monetary incentive. *Chance*, 143 F.3d at 703–04; *see also Braham v. Perelmuter*, No. 3:15-cv-1094 (JCH), 2017 WL 3222532, at *16–17 (D. Conn. July 28, 2017) (denying motion for summary judgment because a reasonable juror could infer "that the defendant-dentist had chosen an unsound—but easier—treatment route by extracting several of the plaintiff's teeth rather than trying to restore them, despite the possibility that extraction could result in the plaintiff's losing more teeth"). "Deliberate indifference may also be inferred where treatment was cursory or evidenced apathy." *Bardo*, 2019 WL 5864820, at *7 (internal quotation marks omitted); *Hannah v. Chouhan*, No. 3:04-cv-314 (JBA), 2005 WL 2042074, at *4 (D. Conn. Aug. 24, 2005); *see also Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994) ("A jury could infer deliberate indifference from the fact that [defendant] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation.").

### a.    Dr. Fisher

Mr. Polk asserts that Dr. Fisher acted with deliberate indifference by failing to provide him with (1) treatment after he determined that the bridge required repair and (2) pain relief.

ECF No. 1, Compl. ¶ 51. Defendants argue that Dr. Fisher provided Mr. Polk with adequate treatment and that Mr. Polk merely disagrees with Dr. Fisher's treatment decisions. ECF No. 36-1, Defs.' Mem. 25-26.

In his declaration, Dr. Fisher says he offered Mr. Polk a treatment plan to address the damaged bridge in September 2020, but Mr. Polk did not agree to the treatment plan until May 2023. ECF No. 36-4, Fisher Decl. ¶¶ 22, 32. In addition, Dr. Fisher represents that he did not prescribe Mr. Polk with any pain medication because he assessed that none was necessary based on his observations. *Id.* ¶ 22. An entry in the medical record indicates Mr. Polk reported intermittent, minor pain at level 3 on September 29, 2020. ECF No. 37, Med. Rec. 19. The medical record further provides that Mr. Polk was thinking about the treatment plan proposed by Dr. Fisher. *Id.* at 24.

Mr. Polk asserts that Defendants are not being truthful about his failure to consent to the treatment plan until May 2023. ECF No. 42, Pl. Resp. 4. According to his verified allegations, Mr. Polk advised Dr. Fisher that he wished to alleviate his "extreme pain" and proceed with the treatment to have his bridge removed even without the proper tool, which could result in further damage to the bridge and his need for a partial denture. ECF No. 1, Compl. ¶¶ 16-17. Relevant to his claim concerning Dr. Fisher's indifference to his pain, Mr. Polk asserts Dr. Fisher refused to provide him with pain relief medication because he did not want to expend resources on Mr. Polk and advised him to purchase over-the-counter pain relief if he was in pain. *Id.* ¶ 18.

On a motion for summary judgment, I cannot resolve the credibility dispute presented by the competing statements from Mr. Polk and Dr. Fisher concerning the lack of treatment of Mr. Polk's pain or whether Mr. Polk expressed his intention to proceed with the proposed

treatment. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 2017) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."). Construed most favorably to Mr. Polk, the evidence raises disputed issues of fact about whether Mr. Polk did, in fact, request to proceed with treatment, and whether Dr. Fisher ignored Mr. Polk's expressions of dental pain and his request to alleviate his pain. *See Bardo*, 2019 WL 5864820, at *6–7 (denying a doctor's motion for summary judgment because a jury could find that the doctor's "treatment of [the plaintiff] was 'cursory,' and thus infer that [the doctor] acted with deliberate indifference toward the patient's condition"); *Faraday v. Lantz*, No. 3:03-cv-1520 (SRU), 2005 WL 3465846, at *6 (D. Conn. Dec. 12, 2005) (denying a doctor's motion for summary judgment because a jury could find that, "without trying to determine the source or cause of [the plaintiff's] complaints of severe pain, [the doctor] simply dismissed his complaints"). Accordingly, I will deny Defendants' motion for summary judgment as to Dr. Fisher.

### b.    Dr. O'Shea

Mr. Polk complains that Dr. O'Shea violated Eighth Amendment standards by subjecting him to unnecessary pain during treatment for his abscess and by failing to provide him follow up treatment. ECF No. 1, Compl. ¶¶ 28, 30-31.

Mr. Polk complains that he endured "acute pain" during the abscess procedure on May 31, 2022 because Dr. O'Shea declined to provide him with anesthetic. *Id.* ¶ 28. The medical record from May 31, 2022 reflects Mr. Polk expressed that he suffered from "very severe pain" at a level 9, and that his dental pain prevented him from eating. ECF No. 37, Med. Rec. 34, 38. Dr. O'Shea noted in the medical record that Mr. Polk was "guarding" the "area due to intense pain." *Id.* at 38. Dr. O'Shea's declaration explains that symptoms from a dental abscess

include: "severe toothache, throbbing near affected tooth, painful jaw, redness or swelling near abscess, tooth sensitivity, pain when biting down, and facial swelling and fever." ECF No. 36-5, O'Shea Decl. ¶ 20. The medical note indicates Dr. O'Shea performed a drainage procedure, provided for post-operation antibiotic (Augmentin)[7] and pain medication, recommended a twenty-four hour follow up, and elevated Mr. Polk's dental classification to 3 as an urgent condition requiring immediate treatment or likely to become emergent in under twelve months. ECF No. 37, Med. Rec. 34, 38; ECF No. 36-5, O'Shea Decl. ¶ 19. Dr. O'Shea's declaration states that Mr. Polk had seen medical staff over the weekend (May 28 and 29, 2022) and had been provided with Tylenol #3, *id.* at 18, but does not address whether Dr. O'Shea provided Mr. Polk with any anesthetic during the abscess drainage procedure for his abscess on May 31, 2022. *See id.* ¶¶ 19, 23.

A reasonable jury reviewing the record evidence could find that Dr. O'Shea acted unreasonably by declining to administer any anesthetic or pain relief measures during the abscess procedure. *See Salahuddin*, 467 F.3d at 279-80 (stating that "prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause," and, conversely, holding that failing "to take reasonable measures" in response to a medical condition can lead to liability"). Accordingly, I deny the motion for summary judgment as to Mr. Polk's claim that Dr. O'Shea violated his Eighth Amendment rights by failing to provide him anesthesia or other pain relief during his abscess procedure.

---

7 Augmentin is an antibiotic used to treat infections caused by bacteria. Drugs.com, Augmentin, https://www.drugs.com/augmentin.html (last visited Mar. 19, 2025).

I conclude, however, that the evidence fails to support Mr. Polk's claim that Dr. O'Shea acted with deliberate indifference to his need for follow up treatment. Mr. Polk has not presented evidence to prevent the inference that Dr. O'Shea acted with sound medical judgment when he assessed that he could not perform the recommended treatment plan for Mr. Polk's damaged bridge and impaired tooth #11 prior to his completion of his antibiotics and reduction of his swelling. *See* ECF No. 36-5, O'Shea Decl. ¶¶ 25-26.

Mr. Polk complains that he was not called back to the dental unit despite Dr. O'Shea's statement he "would automatically be called back." ECF No. 1, Compl. ¶¶ 31-32.[8] But the record indicates that Dr. O'Shea was transferred shortly after June 1, 2022. ECF No. 36-5, O'Shea Decl. ¶ 22. There is no evidence to suggest that Dr. O'Shea had the opportunity to provide further follow up treatment for Mr. Polk but declined to do so. *See Davis v. Supervisor,* No. 3:21-cv-648 (SVN), 2022 WL 3681558, at *6 (D. Conn. Aug. 25, 2022) (dismissing claims against defendant where there was no indication that she could have provided plaintiff with more timely treatment or provision of his medication); *Blaine v. Burnes*, No. 3:20-cv-1039 (KAD), 2020 WL 5659101, at *7 (D. Conn. Sept. 23, 2020) (dismissing claim against defendant where alleged facts failed to suggest that he had an ability to ensure plaintiff was provided with certain medical treatment). The record affords no inference that Dr. O'Shea acted consciously to misrepresent to Mr. Polk that he would be "automatically called back in a week" or that he knew about his transfer to another facility when he communicated to Mr.

---

[8] Mr. Polk has submitted an inmate request dated June 23, 2022, about his waiting to be called back for treatment; it shows he received a response dated July 18, 2022, stating, "You are entered in comp." ECF No. 42, Pl. Resp. 18.

Polk about the follow up. Nor does the record suggest that Dr. O'Shea acted with any culpable recklessness by failing to schedule a follow up appointment for Mr. Polk after June 1, 2022.

Accordingly, I conclude no reasonable jury could conclude that Dr. O'Shea acted with the requisite culpable state of mind to support an Eighth Amendment claim of indifference to Mr. Polk's need for follow up treatment.

### c.    Dr. Mack

Mr. Polk asserts that Dr. Mack acted with deliberate indifference by failing to provide him with timely treatment to relieve his pain associated with his tooth #11 and damaged dental bridge. ECF No. 1, Compl. ¶¶ 42-50. Defendants argue that no reasonable jury could conclude Dr. Mack acted with deliberate indifference to Mr. Polk's serious dental needs. ECF No. 36-1, Defs.' Mem. 28. I disagree.

Mr. Polk states that he advised Dr. Mack that he wished to be provided with the extraction and bridge removal on October 28, 2022, and that Dr. Mack promised to place him on the list for oral surgery. ECF No. 42, Pl. Resp. ¶ 8.

According to the medical note for October 28, 2022, Mr. Polk saw Dr. Mack about a recent fractured tooth, but Dr. Mack only provided Mr. Polk with facial enamel restoration on his tooth #16. ECF No. 37, Med. Rec. 45-47. Dr. Mack states in his declaration that he turned his attention to #16 after Mr. Polk declined the recommended treatment plan for tooth #11 and expressed concern about having a gap in his teeth after its extraction. ECF No. 36-6, Mack Decl. ¶ 12. Dr. Mack explains he assessed that the extraction for tooth #11 would be better performed by an oral surgeon because it was close to the sinus cavity, and he did not submit a request for approval of a specialist for extraction because Mr. Polk had assertedly rejected the treatment plan. *Id.* ¶ 13. Dr. Mack says that he informed Mr. Polk on March 3, 2023 about Dr.

Kasabji's ability to extract the tooth so that he need not wait for a specialist, but Mr. Polk made no final decision about whether to proceed. *Id.* ¶ 14. Dr. Mack states he first assessed that Mr. Polk agreed to the treatment plan on May 23, 2023, after Mr. Polk was advised that the extraction process was being planned and failed to respond. *Id.* ¶ 15.

Despite Dr. Mack's assertions that Mr. Polk did not agree to the treatment plan for his damaged bridge and extraction of tooth #11 until May 23, 2023, there is ample evidence in the record supporting Mr. Polk's assertion that he agreed to the proposed treatment plan much earlier. Dr. O'Shea says in his declaration that on June 1, 2022—almost a year earlier—Mr. Polk expressed his "agreement with the plan of treatment despite the fact that an upper denture could not be fabricated until teeth were extracted, thereby leaving him with an unsightly smile for a period of time." ECF No. 36-5, O'Shea Decl. ¶ 21. The medical record, which Dr. Mack could access for review while treating Mr. Polk, corroborates Dr. O'Shea's statement about Mr. Polk's agreement to the treatment plan. The record from the June 1, 2022 visit states: "pt informed that after full course of abx surgical OSx needs to be planned[.] *He was in agreement* and acknowledged an understanding of the clinical situation." ECF No. 37, Med. Rec. 43 (emphasis added). Dr. Mack's declaration indicates he reviewed Mr. Polk's medical records at the October 28, 2022 visit and observed the records "noted that treatment plan specific to the fix bridge had been discussed with Polk in 2020 when he expressed additional time was needed to consider the plan." ECF No. 36-6, Mack Decl. ¶ 12. Dr. Mack makes no reference in his declaration to the notes from the June 1, 2022 visit with Dr. O'Shea, which was the most recent entry in the dental records at the time of the October 28, 2022 visit with Dr. Mack and which confirmed Mr. Polk wanted to move forward with the treatment plan.

Moreover, Mr. Polk's HSAR dated November 5, 2022—requesting dental treatment from an "outside dentist" for his conditions resulting from his unrepaired bridge—supports Mr. Polk's claim that he wished to pursue the treatment plan when he saw Dr. Mack on October 28, 2022. ECF No. 36-8, HSARs 26. Notably, Mr. Polk stated that the DOC dentist "last week" (presumably Dr. Mack) advised he "may lose . . . three teeth and have to get a partial," but he still requested the dental treatment "A.S.A.P." *Id.* Dr. Mack finally responded to this grievance request three months later on February 6, 2023, stating that a referral was made for oral surgery. *Id.* at 27. This response indicates Dr. Mack's understanding at the time that Mr. Polk wanted to proceed with surgery and is at odds with Dr. Mack's claim in his declaration that he never made a referral for oral surgery and Mr. Polk did not agree to surgery until May 23, 2023. ECF No. 36-6, Mack Decl. ¶¶ 12-14.

Moreover, Dr. Mack's note in the medical record regarding his March 3, 2023 appointment with Mr. Polk is also at odds with the statement in Dr. Mack's declaration that Mr. Polk did not agree to treatment until May 23, 2023. The note reads: "Suffice it to say, it has been determined that Dr. Kasabji will extract tooth #11. Arrangements for such will be made." ECF No. 37, Med. Rec. 52. Mr. Polk again wrote again on May 5, 2023 expressing his desire for treatment as soon as possible, which further supports the view that he was urging treatment earlier than Dr. Mack now acknowledges. *See* ECF No. 42, Pl. Resp. 35.

Accordingly, the record before me creates a question of fact about whether Dr. Mack ignored and unnecessarily delayed Mr. Polk's desire to proceed with the proposed treatment for his damaged bridge and impaired tooth #11. A jury considering Mr. Polk's testimony and the record evidence could conclude that Dr. Mack consciously ignored Mr. Polk's desire to proceed with the treatment plan due to his severe pain and that Dr. Mack's delay in acting on

Mr. Polk's consent to the treatment prolonged his suffering from pain and caused further dental deterioration. As a result, I must deny the motion for summary judgment on Mr. Polk's Eighth Amendment claims against Dr. Mack.

### d.    Dr. Kasabji

Defendants assert that Dr. Kasabji rendered sufficient and adequate dental care by extracting tooth #11 and sectioning the fixed bridge on June 1, 2023. *See* ECF No. 36-1, Defs.' Mem. 28. But Mr. Polk is not challenging the dental treatment actually rendered by Dr. Kasabji. Mr. Polk complains Dr. Kasabji failed to afford him treatment after he became aware of the treatment delay causing dental deterioration and pain. ECF No. 1, Compl. ¶¶ 39-50.

Defendants assert that Dr. Kasabji became aware of Mr. Polk's needs for his unrepaired bridge and tooth #11 "sometime in March 2023." ECF No. 36-2, Defs.' L.R. ¶ 104. Dr. Kasabji states: "I became aware of Polk's dental issue by way of communication with Dr. Alphonso Mack who asked me to extract tooth #11 sometime in March 2023." ECF No. 36-7, Kasabji Decl. ¶ 19. It is not clear from Dr. Kasabji's statement whether he became aware of Mr. Polk's dental issue sometime in March 2023 or whether Dr. Mack asked him to extract Mr. Polk's tooth #11 sometime in March 2023.

Furthermore, record evidence supports the view that Dr. Kasabji became aware of Mr. Polk's dental treatment needs, his desire for treatment, and the length of time he had been waiting for treatment when Dr. Kasabji responded to the inmate request form on February 17, 2023. In the request, Mr. Polk noted he had been complaining about tooth #11 and the pain he had been experiencing for two years and he wanted to ensure he got "adequate care promptly to prevent further damage." ECF No. 36-8, HSARs 31. Dr. Kasabji wrote in response that Mr. Polk's "bridge was treated in the community and the fracture was a result of weak tooth due

to heavy build up and loss of tooth structure," stated that there is no treatment for a fractured tooth other than extraction, and said that "tooth extraction can be done at the facility." *Id*. Dr. Kasabji's response gives rise to the inference that he reviewed Mr. Polk's dental records. At the time Dr. Kasabji entered this response, Mr. Polk's dental classification had been assessed as a Level 3 for an urgent condition since May 31, 2022. *See* ECF No. 37, Med. Rec. 38.

Accordingly, the record supports an inference that by February 17, 2023, Dr. Kasabji was aware of Mr. Polk's urgent need for dental treatment and capable of affording Mr. Polk treatment at DOC but delayed performing the extraction and prolonged Mr. Polk's pain until June 1, 2023. Thus, disputed questions of fact preclude granting the motion for summary judgment in Dr. Kasabji's favor.

## C.    Qualified Immunity

Defendants maintain that they are entitled to the shield of qualified immunity. ECF No. 36-1, Defs.' Mem. 35-38.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is

directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Here, Mr. Polk had a clearly established right under the Eighth Amendment to be provided with dental treatment for his serious dental needs.

Qualified immunity protects state actors when it was objectively reasonable for the state actor to believe that his or her conduct did not violate a clearly established right. *Manganiello v. City of New York,* 612 F. 3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017). Therefore, the Court must assess whether it was objectively reasonable for any of the defendants to believe their conduct was not unlawful at the time. *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015). Summary judgment in favor of an officer defendant is appropriate where "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the [defendant's] conduct under the circumstances." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). In contrast, summary judgment is not warranted if a reasonable jury could conclude that the defendant officers' actions were objectively unreasonable. *Id.* at 420. Conduct is objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances. *Id.* at 420-21; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants argue that reasonable officers could disagree as to whether Defendants violated Mr. Polk's rights in delaying his treatment. ECF No. 36-1, Defs.' Mem. 38. I disagree. For the reasons noted throughout this opinion, taking all factual inferences in Mr. Polk's favor, a reasonable juror could agree with Mr. Polk's assertions that Defendants consciously ignored Mr. Polk's requests to proceed with dental treatment (or unnecessarily subjected him to pain)

and that this conduct, if proven, would be objectively unreasonable. As I have concluded that a reasonable juror could conclude from this record that Defendants' actions were objectively unreasonable, Defendants are not entitled to summary judgment.

### D.    Official Capacity Requests for Relief

Mr. Polk requested an injunctive order for dental treatment for his underlying condition affecting his tooth #11 and to restore his mouth to be reasonably functional and aesthetically pleasing. ECF No. 1, Compl. 17.

In *Ex parte Young*, the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. 209 U.S. 123, 155–56 (1908); *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). Federal courts can order prospective relief "in any civil action with respect to prison conditions," provided it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)) (other citations omitted). Injunctive relief afforded by a court must be narrowly tailored or proportional to the scope of the violation and must extend no further than necessary to remedy the violation. *Brown v. Plata*, 563 U.S. 493, 531 (2011). Thus, I should reject "remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution." *Id.*

Defendants assert that no Defendant is capable of providing Mr. Polk with dental treatment. ECF No. 36-1, Defs.' Mem. 33-34. Defendants maintain that Dr. Fisher and Dr. O'Shea no longer provide dental care to inmates at Cheshire, and that Dr. Mack and Dr. Kasabji have not interacted with Mr. Polk since January 24, 2024 and June 1, 2023, respectively. *Id.* at 34. But Defendants provide no evidence to substantiate that Dr. Kasabji, who is the Director of the DOC Dental Department, could not provide or facilitate dental treatment for Mr. Polk, if necessary. At this juncture, I decline to grant summary judgment on Mr. Polk's Eighth Amendment official capacity claims.

IV.   **CONCLUSION**

For the foregoing reasons, the motion for summary judgment is DENIED in part and GRANTED in part. I GRANT the motion for summary judgment as to Mr. Polk's Eighth Amendment claim against Dr. O'Shea for failing to provide follow up treatment for his damaged bridge and tooth #11 on and after June 1, 2022. The motion for summary judgment is otherwise DENIED.

**SO ORDERED.**

Bridgeport, Connecticut
March 31, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

35